UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILFRIDO BONILLA,

                    Plaintiff,

        -v.-

CITY OF NEW YORK, SERGEANT
JOHN DEBENEDETTO, SERGEANT
JASON ISAIA, LIEUTENANT PAUL
GAGLIA, and DEPUTY INSPECTOR
VINCENT SALERNO,

                    Defendants.

---

18 Civ. 12142 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Wilfrido Bonilla, an officer in the New York City Police

Department (the "NYPD"), brings this suit against the City of New York and

several of his supervising officers, claiming race discrimination, hostile work

environment, retaliation, sexual harassment, and sex discrimination under

Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law,

the New York City Human Rights Law, and the Equal Protection Clause of the

Fourteenth Amendment.  In broad summary, Bonilla, who is originally from the

Dominican Republic, alleges that: (i) one of his supervisors repeatedly used a

racial slur when talking to Bonilla; (ii) Bonilla was treated differently from the

white officers at his precinct; and (iii) another supervisor sexually harassed

Bonilla on multiple occasions.  Defendants have moved to dismiss thirteen of

the sixteen claims in the operative complaint on the grounds that: (i) Bonilla

failed to exhaust certain of his Title VII claims; (ii) certain of Bonilla's non-

federal claims are barred by the election of remedies doctrine; and (iii) Bonilla

failed to state a claim for discrimination, hostile work environment, or retaliation under Title VII.  For the reasons set forth in the remainder of this Opinion, Defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Alleged Discrimination Against Bonilla in the 44th Precinct

Bonilla is a Latin American male originally from the Dominican Republic. (Compl. ¶ 6).  He has worked as an NYPD officer since at least January 2016.

---

[1]    The facts contained in this Opinion are drawn principally from Plaintiff's Amended Complaint, which is the operative pleading in this case and is referred to in this Opinion as the "Complaint" (Compl. (Dkt. #28)).  The Court has not considered the declaration submitted by Bonilla as part of his submission in opposition to Defendants' motion to dismiss.  (*See* Dkt. #39).  Bonilla submitted this declaration without citing any legal authority in support of the Court's ability to consider such a declaration in connection with the motion to dismiss, and therefore, the Court does not consider it for purposes of resolving this motion.  *See Marolla* v. *Devlyn Optical LLC*, No. 18 Civ. 7395 (VSB), 2019 WL 4194330, at *4 n.5 (S.D.N.Y. Sept. 3, 2019) (citing *Goodman* v. *Port Auth. of New York & New Jersey*, 850 F. Supp. 2d 363, 381 (S.D.N.Y. 2012) ("Plaintiff's additional factual assertions, provided in his opposition papers and affidavit, are inadmissible."); *Wachtel* v. *Nat'l R.R. Passenger Corp.*, No. 11 Civ. 613 (PAC), 2012 WL 292352, at *2 (S.D.N.Y. Jan. 30, 2012) ("While Plaintiff attached an affidavit to his opposition brief in an attempt to support his argument, the Court cannot consider affidavits in ruling on a motion to dismiss.")); *see also Troy* v. *City of New York*, No. 13 Civ. 5082 (AJN), 2014 WL 4804479, at *1 (S.D.N.Y. Sept. 25, 2014) ("[T]he Court does not rely on factual assertions made for the first time in Plaintiff's opposition brief … as it is axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to dismiss." (internal citations and quotation marks omitted)), *aff'd*, 614 F. App'x 32 (2d Cir. 2015) (summary order).

The Court also draws facts from the exhibits attached to the Declaration of Assistant Corporation Counsel Evan M. Piercey in Support of Defendants' Partial Motion to Dismiss the Amended Complaint, referred to as the "Piercey Decl." (Dkt. #33), of which the Court takes judicial notice.  *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." (internal quotation marks and alterations omitted)); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing documents that may be properly considered in resolving a motion to dismiss).

(*Id.* at ¶ 10). Throughout 2016 and 2017, with the exception of a few months, Bonilla worked out of the 44th Precinct, located at 2 East 169th Street in the Bronx. (*Id.* at ¶ 11). While working at the 44th Precinct, Bonilla was supervised by Sergeant John Debenedetto, Sergeant Jason Isaia, and Lieutenant Paul Gaglia, who are all white males and who are all named as Defendants in this case. (*Id.*).

Bonilla alleges that he faced discrimination based on his race and national origin during the time he was assigned to the 44th Precinct. As one example of this, Bonilla points to the fact that Sergeant Debenedetto called Bonilla the name "Willy Bobo" on more than forty occasions. (Compl. ¶ 12). The term "bobo" means "fool" in Spanish, and according to Bonilla, "Willy Bobo" is a racial slur used for Latin Americans. (*Id.*). Bonilla regularly requested that Sergeant Debenedetto stop using this nickname to refer to Bonilla, but Sergeant Debenedetto ignored his complaints. (*Id.* at ¶ 13).

In January 2016, Bonilla repeatedly complained about Sergeant Debenedetto's use of the term "Willy Bobo" to Sergeant Debenedetto and Sergeant Isaia; as well as to Lieutenant Gaglia; the 44th Precinct's Patrolman's Benevolent Association ("PBA") Trustee; Police Officer Gary Martin; and Bonilla's PBA delegate, Police Officer Mitchell. (Compl. ¶ 14). Bonilla's

---

For ease of reference, the Court refers to the parties' briefing as follows: Defendants' opening brief as "Def. Br." (Dkt. #32); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #38); and Defendants' reply brief as "Def. Reply" (Dkt. #40).

The Court uses "Count" and "Cause of Action" interchangeably to refer to Plaintiff's claims. In addition, to the extent the Complaint omits the first names of certain parties, the Court omits them as well.

complaints were ignored and Sergeant Debenedetto continued to call Bonilla "Willy Bobo" every time they came into contact.  (*Id.*).

In July 2016, while on detail at Yankee Stadium, Lieutenant Gaglia assigned Bonilla to guard a sanitation truck and ordered Bonilla to remain guarding the truck even after Bonilla's shift ended.  (Compl. ¶ 15).  Bonilla claims that this assignment was unnecessary and only intended to humiliate and punish him.  (*Id.*).  He alleges that no other police officer on detail at Yankee Stadium was ever assigned to guard a sanitation truck.  (*Id.*).

Worse yet, when Bonilla was on detail at Yankee Stadium in 2016, he was regularly ordered to clean the bathrooms.  (Compl. ¶ 22).  This was not a job that was assigned to police officers, nor was it their responsibility.  (*Id.*).  Bonilla claims that this assignment was designed to punish and humiliate him.  (*Id.*).  He further avers that white police officers who were also assigned to the Yankee Stadium detail, such as Police Officer Anglero, were never ordered to clean the bathrooms.  (*Id.* at ¶ 23).

On October 20, 2016, Bonilla, accompanied by Sergeant Dominguez, responded to a robbery in progress in the vicinity of 161st Street and Melrose Avenue in the Bronx.  (Compl. ¶ 16).  While arresting the suspect, Bonilla was struck in the face and head and suffered a concussion.  (*Id.*).  As a result of the concussion, Bonilla was unable to work for one and one-half weeks.  (*Id.* at ¶ 17).  Bonilla applied to designate his injury as having been incurred in the line of duty, but his application was denied.  (*Id.*).  Bonilla was thus forced to use accumulated sick time.  (*Id.*).

When Bonilla returned to work following the October 20, 2016 incident, he began having problems with his balance due to swelling in his brain caused by the injury he sustained. (Compl. ¶ 18). As a result of this balance issue, Bonilla was forced to miss an additional three weeks of work. (*Id.*). Bonilla again applied for a line of duty injury designation. (*Id.* at ¶ 20). His request was denied except for five days. (*Id.*). Bonilla claims that multiple white officers in the 44th Precinct were granted line of duty injury designations after they suffered injuries in similar circumstances. (*Id.* at ¶ 21).

Bonilla's medical issues did not improve, and in December 2016, he was placed on restricted duty as a result. (Compl. ¶ 25). Despite this designation, Bonilla was regularly ordered by his supervisors, including Integrity Control Officer ("ICO") Lieutenant Gilbert Morales, to participate in arrests. (*Id.* at ¶ 26). This was unusual, as officers on restricted duty were usually not required to participate in arrests. (*Id.*). When Bonilla explained to ICO Morales that he was on restricted duty, ICO Morales stated that he did not care and compelled Bonilla to participate in arrests. (*Id.*).

In or around December 2016, Bonilla was transferred from the 44th Precinct to the Firearms Suppression Unit in Manhattan. (Compl. ¶ 28). In February 2017, Bonilla took, and passed, the Civil Service Examination for promotion to the rank of sergeant. (*Id.* at ¶ 29). Passing this examination qualified Bonilla to be promoted to sergeant, but on multiple occasions Bonilla was passed over for promotion. (*See id.* at ¶¶ 29-30). On or about March 2017, Bonilla was transferred back to the 44th Precinct. (*Id.*).

Upon Bonilla's return to the 44th Precinct, he was regularly assigned to foot posts without a partner and to hospitalized prisoner detail. (Compl. ¶¶ 32, 33). According to Bonilla, Sergeants Debenedetto and Isaia gave him these assignments to ensure that Bonilla would not get any arrest or summons activity during his tours. (*Id.* at ¶ 34). This was professionally detrimental to Bonilla because police officers are required to report such activity on a monthly basis, and an officer's lack of arrest and summons activity would be considered a poor or below-average job performance. (*Id.* at ¶ 35). All the while, white officers in the 44th Precinct were given: (i) more favorable and less dangerous assignments; (ii) more overtime; (iii) higher performance evaluations; (iv) greater opportunities to be promoted; and (v) routine approvals for second jobs in the same circumstances in which the opportunity had been denied to Bonilla. (*Id.* at ¶¶ 36, 103).

In February 2017, Bonilla's mother-in-law passed away and he requested a few days off to mourn and to attend to his children while his wife mourned the loss of her mother. (Compl. ¶ 37). Bonilla's request was denied, despite the fact that white police officers in the 44th Precinct who had suffered similar losses were granted time off for bereavement. (*Id.* at ¶ 38).

On July 5, 2017, Bonilla filed a written internal complaint with the NYPD explaining that he had been subjected to race discrimination, in the form of a hostile work environment, due to the conduct of Sergeants Debenedetto and Isaia. (Compl. ¶ 40). Bonilla also complained to Officer Mitchell and ICO Morales. (*Id.* at ¶ 39). In response to Bonilla's complaint, ICO Morales laughed

at Bonilla and treated him with disdain. (*Id.* at ¶ 41). Neither ICO Morales nor Officer Mitchell took any action to investigate Bonilla's complaint. (*Id.* at ¶ 42). Quite to the contrary, ICO Morales ordered Bonilla to place his gun in his locker — the protocol when it is believed that an NYPD officer is suicidal. (*Id.* at ¶ 43). According to Bonilla, ICO Morales did not have any reasonable basis to believe that Bonilla was in fact suicidal; ICO Morales was merely attempting to punish Bonilla by having his gun and badge withdrawn for mental health reasons. (*Id.* at ¶¶ 43, 44). Had ICO Morales really believed that Bonilla had mental health issues, he would have followed NYPD standard procedure and arranged a follow-up assessment of Bonilla; no such assessment was ever sought. (*Id.* at ¶ 45).

Bonilla describes another disquieting incident that occurred in July 2017: While Bonilla was working at his foot post, ICO Morales and another sergeant arrived and requested Bonilla's department-assigned cell phone. (Compl. ¶ 48). Bonilla informed ICO Morales that his cell phone was not working properly. (*Id.* at ¶ 49). Bonilla then obtained permission from his supervisors to go to One Police Plaza, while on duty, to get his cell phone repaired. (*Id.* at ¶ 50). While at One Police Plaza, repairing his cell phone, Bonilla received a call from Sergeant Isaia, who cursed at Bonilla and stated, "Fuck you, you motherfucker. Who gave you permission?" (*Id.* at ¶ 51). Bonilla told Sergeant Isaia that the desk sergeant had given him permission to go to One Police Plaza to get his phone repaired. (*Id.* at ¶ 52). Sergeant Isaia screamed at Bonilla and ordered him to return immediately to the 44th

Precinct.  (*Id.* at ¶ 53).  Bonilla complied with Sergeant Isaia's request, but when Bonilla returned to the Precinct, he was met with a barrage of profanity and yelling from Sergeant Isaia, who humiliated him in front of everyone at the Precinct.  (*Id.* at ¶ 54).

As punishment for his supposed insubordination, Bonilla was ordered to stand in the back of the Precinct for the rest of his shift, a period of approximately three hours.  (Compl. ¶ 55).  Sergeant Isaia told Bonilla that if he did not comply with this order, he would be suspended.  (*Id.* at ¶ 56). Bonilla complied.  (*Id.*).  However, while standing in the back of the Precinct, Bonilla called the front desk to ask at what time he would be allowed to take his meal for the tour.  (*Id.* at ¶ 57).  The desk sergeant informed Bonilla that he could take his meal after the tour was over, which Bonilla understood to be a punitive measure, since every police officer routinely takes a meal while on tour.  (*Id.*).

After standing for a considerable amount of time without eating, Bonilla began to feel faint.  (Compl. ¶ 58).  Bonilla left his post and approached the desk.  (*Id.*).  At the desk, Bonilla explained to Sergeants Debenedetto and Isaia that he was feeling faint from a lack of nourishment.  (*Id.*).  In response, Sergeants Debenedetto and Isaia immediately took Bonilla's gun and badge and dragged him by the arm to the locker room, where they both pushed Bonilla up against the wall.  (*Id.* at ¶ 59).  Sergeant Isaia placed his forearm against Bonilla's neck, choking him, and Sergeant Debenedetto kneed Bonilla

in the testicles. (*Id.* at ¶¶ 60, 61). Bonilla ultimately lost consciousness as a result of Sergeant Isaia placing him in a chokehold. (*Id.* at ¶ 62).

When Bonilla regained consciousness, he was in an ambulance being transported to a hospital. (Compl. ¶ 63). After speaking with the EMTs in the ambulance, it became clear to Bonilla that Sergeants Debenedetto and Isaia had told the EMTs that Bonilla was suicidal and needed to be taken to the hospital. (*Id.* at ¶ 64). Bonilla believes that Sergeants Debenedetto and Isaia told the EMTs that Bonilla was suicidal in order to cover up their physical maltreatment and unwarranted assault on Bonilla. (*Id.* at ¶¶ 65, 66). Bonilla alleges that in the events leading up to the incident in the locker room, he had not done or said anything that could be interpreted as suicidal. (*Id.* at ¶ 67).

The ambulance took Bonilla to the Columbia Presbyterian Hospital emergency room, where, for three days, he was held against his will. (Compl. ¶ 68). Bonilla was then transferred to the psychiatric emergency room of the same hospital, where he was held against his will for an additional six days while being watched for signs of suicidal ideation. (*Id.* at ¶ 69). Bonilla explained to the doctors at the psychiatric emergency department that he was never suicidal and had been sent to the hospital fraudulently after being assaulted by two of his supervisors. (*Id.* at ¶ 70). Bonilla was ultimately discharged without any explanation. (*Id.* at ¶ 71).

Following Bonilla's discharge from the hospital, he returned to work at the 44th Precinct. (Compl. ¶ 72). When Bonilla returned to work, Traffic Safety Sergeant Anderson laughed at him. (*Id.* at ¶ 73). Following his

hospitalization, Bonilla renewed his request to Sergeant Debenedetto to stop calling him "Willy Bobo." (*Id.* at ¶ 74). Sergeant Debenedetto responded by banning Bonilla from his office, telling him "Don't come here anymore." (*Id.*).

Bonilla applied for line of duty injury designation regarding the injury he sustained in the assault by his supervisors. (Compl. ¶ 75). His application was denied. (*Id.*). However, in August 2017, Bonilla was told that his application would be granted if he agreed to sign a paper stating that he (Bonilla) had been unprofessional and had left his post on the date he was assaulted. (*Id.* at ¶ 76). Bonilla refused to adopt this version of the incident, which he considered to be patently false. (*Id.*). In consequence, from July through September 2017, Bonilla was denied overtime. (*Id.* at ¶ 82).

### 2. Bonilla's 2017 Complaints About Discrimination in the 44th Precinct

In September 2017, Bonilla met with New York City Councilman Ritchie Torres. (Compl. ¶ 77). Following the meeting, Bonilla received a call from Assistant ICO Sergeant Sanchez, who immediately asked where Bonilla had been and indicated that he knew that Bonilla had met with Councilman Torres. (*Id.* at ¶ 79). During this conversation, Sergeant Sanchez stated that Bonilla's meeting with Councilman Torres had been discussed by Sergeant Debenedetto and Debenedetto's supervisors. (*Id.* at ¶ 80).

In December 2017, Bonilla filed a complaint with the NYPD's internal anti-discrimination unit, the Office of Equal Employment Opportunity (the "OEEO"), detailing the race discrimination and hostile work environment he had experienced at the 44th Precinct. (Compl. ¶¶ 89, 90). Around this time,

Bonilla also filed a complaint with the New York State Division of Human Rights (the "SDHR"), claiming that since approximately July 15, 2017, the NYPD had discriminated against him on the basis of his age, national origin, race, and disability, by: (i) denying him training; (ii) denying him a promotion/pay raise; (iii) denying him sick benefits and a meal period; and (iv) giving him different assignments and duties than other officers (the "December 2017 SDHR Complaint"). (*See* Piercey Decl., Ex. B).

On January 18, 2018, Bonilla filed a second complaint with the SDHR (the "January 2018 SDHR Complaint"), generally alleging that the NYPD had discriminated against him on the basis of his national origin, race, age, purported disability, and creed (Christian), and specifically claiming that the NYPD had discriminatorily: (i) denied him leave time and/or other benefits; (ii) denied him a promotion; (iii) placed him on modified assignment; (iv) denied him training; (v) given him different or worse job duties than other officers; (vi) demoted him; and (vii) subjected him to retaliation. (*See* Piercey Decl., Ex. D).

On June 4, 2018, the SDHR issued a Determination and Order that found "No Probable Cause" to believe that the NYPD had engaged in any of the unlawful discrimination alleged in the December 2017 SDHR Complaint. (Piercey Decl., Ex. C).[2] In its Determination, the SDHR noted that: (i) Bonilla had not demonstrated that he suffered any adverse employment actions during

---

[2] The Court includes the two SDHR determinations for completeness, but does not rely on either in assessing the merits of Bonilla's Complaint.

the "one year period that preceded the filing of [his] complaint"; (ii) the removal of Bonilla's firearm had been justified; and (iii) Bonilla had "failed to provide any evidence of discrimination."  (*Id.*).

On July 23, 2018, the SDHR issued a Determination and Order on the January 2018 SHDR Complaint, similarly finding "No Probable Cause" to believe that the NYPD had engaged in any of the unlawful practices complained of by Bonilla.  (Piercey Decl., Ex. E).  The SDHR observed that Bonilla had failed to present any evidence establishing a "causal nexus" between Bonilla's complained-of actions, and his age, creed, race/color, national origin, or prior complaints of discrimination.  (*Id.*).  Furthermore, the SDHR found that Bonilla had failed to present evidence that any delay in his promotion was discriminatory.  (*Id.*).

### 3.  Bonilla's Sexual Harassment at the PSA 6 Bronx VIPER Unit

In September 2017, Bonilla was transferred to the Police Service Area ("PSA") 6 Bronx Video Interactive Patrol Enhancement Response ("VIPER") Unit. (Compl. ¶ 81).  While working in this Unit, Bonilla was sexually harassed by Deputy Inspector Victor Salerno.  (*Id.* at ¶ 86).  From October to December 2017, Salerno would regularly follow Bonilla into the bathroom and position himself to look at Bonilla through the gap in the stall and underneath the door. (*Id.* at ¶ 87).  This conduct made Bonilla deeply uncomfortable and prompted him to complain to OEEO in December 2017 about Salerno's actions.  (*Id.* at ¶¶ 87, 91).

In January 2018, Salerno again followed Bonilla to the bathroom and stared at Bonilla's penis while Bonilla used the urinal. (Compl. ¶ 92). Salerno also sidled up to Bonilla and rubbed his genitals against Bonilla's back through his pants. (*Id.* at ¶ 93). Following this incident, Salerno taunted Bonilla by stating, "I am a deputy inspector, what are you going to do?" (*Id.* at ¶ 94). Bonilla alleges that Salerno had similarly harassed other police officers. (*Id.* at ¶¶ 88, 95).

Following the January incidents, Bonilla complained to Lieutenant McCormick and Sergeant Epsy about Salerno brushing Bonilla's back with his genitals, following Bonilla into the bathroom, and staring at Bonilla's genitals. (Compl. ¶ 96). Bonilla's complaints went ignored. (*Id.* at ¶ 97). Bonilla then reported Deputy Inspector Salerno to the NYPD Internal Affairs Bureau (the "IAB"). (*Id.* at ¶ 99). Around February 28, 2018, Bonilla was interviewed by the IAB regarding his complaints. (*Id.* at ¶ 100). Bonilla was also transferred a to the PSA 7 Bronx VIPER Unit at this time. (*Id.* at ¶ 101).

## B. Procedural Background

Bonilla filed his initial complaint in this action on December 22, 2018. (Dkt. #1). The parties appeared before the Court for an initial pretrial conference on April 17, 2019. (Dkt. #29 (transcript of hearing)). On May 21, 2019, Bonilla filed an amended complaint (the "Complaint") alleging the following claims: discrimination based on race and national origin, hostile work environment based on race, and sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e to 2000e-

17;[3] the New York State Human Rights Law, N.Y. Exec. Law §§ 290-297 (the "NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107 to 8-131 (the "NYCHRL"). (Dkt. #28).[4] On June 17, 2019, Defendants filed a motion to partially dismiss the Complaint and a supporting declaration. (Dkt. #32, 33, 34). Bonilla filed a brief in opposition to the motion to dismiss on August 9, 2019, as well as a supporting declaration. (Dkt. #38, 39). Defendants filed their reply brief on September 9, 2019. (Dkt. #40).

## DISCUSSION

### A. The Court Dismisses Certain of Bonilla's Claims Without Prejudice for Failure to Exhaust

#### 1. Title VII's Exhaustion Requirement

Prior to commencing an action under Title VII, a plaintiff must exhaust all available administrative remedies. *See* 42 U.S.C. § 2000e-5(e), (f)(1); *Ragone* v. *Atlantic Video at Manhattan Center*, 595 F.3d 115, 126 (2d Cir. 2010). The

---

[3]   At times Bonilla describes his Title VII disparate treatment claim as one for race discrimination, and at times he describes it as one for race and national origin discrimination. Generally speaking, this Court will refer to the claim as one for race discrimination.

[4]   Specifically, Bonilla's Complaint claims: (i) race discrimination in violation of Title VII; (ii) race discrimination in violation of NYSHRL § 296; (iii) race discrimination in violation of the NYCHRL; (iv) race discrimination by virtue of a hostile work environment in violation of Title VII; (v) race discrimination by virtue of a hostile work environment in violation of NYSHRL § 296; (vi) race discrimination by virtue of a hostile work environment in violation of the NYCHRL; (vii) retaliation for complaining about race discrimination in violation of Title VII; (viii) retaliation for complaining about race discrimination in violation of NYSHRL § 296; (ix) retaliation for complaining about race discrimination in violation of the NYCHRL; (x) hostile work environment due to sexual harassment in violation of Title VII; (xi) hostile work environment due to sexual harassment in violation of NYSHRL § 296; (xii) hostile work environment due to sexual harassment in violation of the NYCHRL; (xiii) sex discrimination in violation of the Fourteenth Amendment's Equal Protection Clause; (xiv) retaliation for complaining about sexual harassment in violation of Title VII; (xv) retaliation for complaining about sexual harassment in violation of NYSHRL § 296; (xvi) retaliation for complaining about sexual harassment in violation of the NYCHRL. (Dkt. #28).

purpose of the exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action. *Fowlkes* v. *Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015). The exhaustion requirement applies to *pro se* and counseled plaintiffs alike. *Id.*

Exhaustion of administrative remedies through the EEOC is an essential element of the Title VII statutory scheme, and it is a precondition to bringing such claims in federal court. *Legnani* v. *Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (observing that under Title VII, "a claimant may bring suit in federal court only if she has filed a timely complaint with the EEOC and obtained a right-to-sue letter"). As such, "a district court may only hear claims that are either included in the [plaintiff's] EEOC charge or are based on conduct which is reasonably related to conduct alleged in the EEOC charge." *Fiscina* v. *New York City Dist. Council of Carpenters*, 401 F. Supp. 2d 345, 356 (S.D.N.Y. 2005) (alterations omitted). Claims that are not exhausted must be dismissed without prejudice. *See Standard Inv. Chartered, Inc.* v. *Nat'l Ass'n of Sec. Dealers, Inc.*, 560 F.3d 118, 124 (2d Cir. 2009) (holding that "a dismissal for failure to exhaust available administrative remedies should be 'without prejudice' as we have previously ruled" (citing cases)).

The Second Circuit instructs that "'a claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Williams* v. *N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Fitzgerald* v. *Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001)). To

15

determine whether a claim is "reasonably related" to a claim included in an EEOC charge, courts should focus "on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving," and ask the "central question" of "whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Id.* (internal quotations marks and alterations omitted).

### 2. Bonilla's Sexual Harassment Claims Under Title VII Have Not Been Exhausted

The Complaint alleges that Bonilla received a right-to-sue letter from the EEOC, but Bonilla did not attach this letter to the Complaint, nor did he specify the underlying administrative charges to which the letter pertained. (Compl. ¶ 3). The Piercey Declaration attaches as exhibits two right-to-sue letters Bonilla received from the EEOC. (*See* Piercey Decl., Ex. F). Those exhibits show that Bonilla received a right-to-sue letter dated September 21, 2018, for EEOC Charge No. 16G-2018-01440, which corresponds to the December 2017 SDHR Complaint (*compare* Piercey Decl., Ex. F at 1, *with id.*, Ex. C), and a second right-to-sue letter dated November 2, 2018, for EEOC Charge No. 16G-2018-02260, which corresponds to the January 2018 SDHR Complaint (*compare* Piercey Decl., Ex. F at 2, *with id.*, Ex. E).[5]

---

[5] On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court may consider the SDHR complaints and orders and the EEOC filings because they are public documents and integral to a plaintiff's claims. *See, e.g., Saudagar* v. *Walgreens Co.*, No. 18 Civ. 437 (KPF), 2019 WL 498349, at *4 (S.D.N.Y. Feb. 8, 2019) ("In order to address certain of Defendants' arguments, the Court will take judicial notice of the []SDHR Order and the EEOC Notice."); *Kouakou* v. *Fideliscare N.Y.*, 920 F. Supp. 2d 391, 394 n.1 (S.D.N.Y.

As Bonilla concedes, his SDHR complaints failed to allege discrimination or retaliation based on gender. (*See* Piercey Decl., Ex. B, D; Pl. Opp. 3 ("Plaintiff concedes that his sexual harassment claims were not previously asserted before the EEOC and that unless the court finds an equitable exception, plaintiff's Title VII sexual harassment claims are subject to dismissal[.]")). Moreover, Bonilla did not list Defendant Salerno as an alleged "individual who discriminated against him" in either of his SDHR complaints. (*See* Piercey Decl., Ex. B at 1, Ex. D at 1). Consequently, Bonilla's claims of sexual harassment and retaliation for complaints of gender-based discrimination and sexual harassment were not raised before the EEOC.

Bonilla makes no attempt to argue that these claims are reasonably related to the discrimination claims that he did raise before the EEOC, and the Court concludes that they are not reasonably related. *See Shands* v. *Lakeland Cent. Sch. Dist.*, No. 15 Civ. 4260 (KMK), 2017 WL 1194699, at *4 (S.D.N.Y. Mar. 30, 2017) ("Courts in the Second Circuit have generally held that claims alleging discrimination based upon a protected classification which are different than the protected classification asserted in administrative filings are not reasonably related." (citing cases)). Defendant Salerno's alleged sexual harassment of Bonilla was not part of the pattern of discriminatory conduct Bonilla alleged in his SDHR complaints, nor is it alleged that such harassment was in retaliation for Bonilla's complaints about discrimination. Likewise,

2012) ("Because the EEOC Charge is part of an administrative proceeding, the Court may take judicial notice of it without converting Defendant's motion into a motion for summary judgment.").

there was nothing in either of Bonilla's SDHR complaints that would have given the relevant administrative agencies adequate notice to investigate the sexual harassment claims that Bonilla now raises. Accordingly, Bonilla has not exhausted his claims of gender-based harassment or retaliation under Title VII, and his claims for the same (Causes of Action 10 and 14) are dismissed without prejudice.[6]

## B. The Court Dismisses Certain of Bonilla's Claims Based on the Election of Remedies Doctrine

### 1. Applicable Law

Under the election of remedies doctrine, a complainant who files a complaint with either the SDHR or the New York City Commission on Human Rights (the "CCHR") cannot subsequently sue in court on the same claims. *Bray* v. *N.Y.C. Dep't of Educ.*, No. 11 Civ. 7884 (DLC), 2013 WL 3481532, at *11 (S.D.N.Y. July 10, 2013). That rule is set forth in the text of both the NYSHRL and the NYCHRL. *See York* v. *Assoc. of the Bar of City of New York*, 286 F.3d 122, 127 (2d Cir. 2002); *Higgins* v. *NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 187 (S.D.N.Y. 2011). Section 297(9) of the New York State Executive Law, which is part of the NYSHRL, reads, in relevant part:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages, ... unless such person had filed a complaint hereunder or

---

[6] The Court recognizes that exhaustion of administrative remedies through the EEOC is not a jurisdictional prerequisite to suit in federal court, and, therefore, is subject to equitable exceptions. *See Fowlkes* v. *Ironworkers Local 40*, 790 F.3d 378, 384-86 (2d Cir. 2015); *accord Zipes* v. *Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). However, Bonilla provides the Court with no justification for why he did not include his sexual harassment claims in either of his two SDHR complaints, and the Court finds no equitable exception that would excuse the exhaustion requirement in this case.

> with any local commission on human rights, ... provided
> that, where the division has dismissed such complaint
> on the grounds of administrative convenience, on the
> grounds of untimeliness, or on the grounds that the
> election of remedies is annulled, such person shall
> maintain all rights to bring suit as if no complaint had
> been filed with the division.

N.Y. Exec. Law § 297(9). Section 8-502(a) of the New York City Administrative

Code contains an analogous election of remedies clause:

> Except as otherwise provided by law, any person
> claiming to be aggrieved by an unlawful discriminatory
> practice as defined in chapter 1 of this title or by an act
> of discriminatory harassment or violence as set forth in
> chapter 6 of this title shall have a cause of action in any
> court of competent jurisdiction ... unless such person
> has filed a complaint with the city commission on
> human rights or with the state division of human rights
> with respect to such alleged unlawful discriminatory
> practice or act of discriminatory harassment or
> violence.

N.Y.C. Admin. Code § 8-502(a); *see also Dixon* v. *Krasdale Foods, Inc.*, No. 13

Civ. 3045 (CM), 2013 WL 6334439, at *2 (S.D.N.Y. Dec. 4, 2013) (noting

similarity).

Thus, under both the NYSHRL and the NYCHRL, "the remedies of

administrative review through the [SDHR and CCHR] or judicial review are

*mutually exclusive.*" *Moodie* v. *Fed. Reserve Bank of N.Y.*, 58 F.3d 879, 882 (2d

Cir. 1995) (emphasis in original). "Once a complainant elects the

administrative forum by filing a complaint with the [SDHR or CCHR], a

subsequent judicial action on the same complaint is *generally barred.*" *Id.* at

883 (emphasis in original). What is more, "[t]he election of remedies bar is

jurisdictional; a complaint that has previously been dismissed by the [SDHR or

CCHR] must be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1)." *Marecheau* v. *Equal Emp't Practices Comm'n*, No. 13 Civ. 2440 (VEC), 2014 WL 5026142, at *4 (S.D.N.Y. Sept. 30, 2014).

The election of remedies doctrine imposes two kinds of jurisdictional bars: one direct and one derivative. *See Smith* v. *Sch. of Visual Arts*, No. 15 Civ. 8049 (RA), 2016 WL 3440553, at *2 (S.D.N.Y. June 9, 2016). The direct bar divests a court of subject matter jurisdiction over any claims previously submitted to the SDHR or CCHR (the direct bar). *Id.* The derivative bar prevents courts from hearing "'claims arising out of the same incident[s] on which [an SDHR or CCHR] complaint was based.'" *Id.* (quoting *Higgins*, 836 F. Supp. 2d at 188). Because of the derivative bar, "[c]laims need not be identical in order to be barred by the state or city election of remedies provisions." *Rosario* v. *N.Y.C. Dep't of Educ.*, No. 10 Civ. 6160 (DLC), 2011 WL 1465763, at *2 (S.D.N.Y. Apr. 15, 2011). If "a sufficient identity of issue[s] exists between" the claims a plaintiff pursued before the SDHR or CCHR, and those he alleges in his complaint, then the election of remedies doctrine precludes a court from adjudicating his claims. *Id.* (quoting *Spoon* v. *Am. Agriculturalist, Inc.*, 478 N.Y.S.2d 174, 175 (3d Dep't 1984)).

The election of remedies derivative bar is expansive. A plaintiff cannot escape the bar by raising a new legal theory if that theory is premised on the same events underlying his SDHR or CCHR complaint. *Owens* v. *Starbucks Corp.*, 37 N.Y.S.3d 207, 2016 WL 1602753, at *3 (N.Y. Sup. Ct. Apr. 21, 2016);

*see, e.g., Rasmy* v. *Marriott Int'l, Inc.*, No. 16 Civ. 4865 (AJN), 2017 WL 773604, at *2, 5 (S.D.N.Y. Feb. 24, 2017) (finding that election of remedies doctrine barred plaintiff from pursuing NYCHRL hostile work environment claim in federal court, even though he sought relief under only the NYSHRL before the SDHR, because in both actions plaintiff's claims "ar[o]se from the same discriminatory practices" and were "premised on substantially the same series of incidents" (internal quotation marks omitted)); *Musaji* v. *Banco do Brasil*, No. 10 Civ. 8541 (RJH), 2011 WL 2507712, at *5 (S.D.N.Y. June 21, 2011) (collecting New York cases supporting the proposition that "a plaintiff merely asserting a new legal theory in front of a court based on the same underlying conduct alleged at the [CCHR] is barred from the judicial remedy sought"); *Rosario*, 2011 WL 1465763, at *2 (finding that court lacked subject matter jurisdiction to consider plaintiff's claim that he was suspended from work based on his nationality, even though before the SDHR plaintiff argued that he was discriminated against "based on [his] arrest record, marital status, and sex," because in both proceedings plaintiff claimed that "he was suspended due to a discriminatory practice" and "the underlying facts of the claim [plaintiff] brought before the []SDHR [were] almost identical to those alleged in [his federal] case").

Nor can a plaintiff evade the derivative bar by suing a defendant who was not named in his SDHR or CCHR proceeding. *See, e.g., Vargas* v. *Reliant Realty*, No. 13 Civ. 2341 (PGG), 2014 WL 4446165, at *7-8 & n.9 (S.D.N.Y. Sept. 9, 2014) (finding that plaintiff could not pursue NYSHRL claim against

defendant not named in plaintiff's SDHR complaint, because "the claims underlying [plaintiff's] []SDHR complaint [were] identical to those raised in" his federal suit); *El Sayed* v. *Hilton Hotels Corp.*, No. 07 Civ. 11173 (DC), 2008 WL 3362828, at *4-5 (S.D.N.Y. Aug. 7, 2008) (reaching same result where plaintiff sued two defendants not named in his SDHR complaint).

Put simply, "[w]hen a plaintiff files a complaint with the [CCHR or SDHR], no [NYCHRL or NYSHRL] claims arising from the same facts can be adjudicated in federal court." *Alston* v. *Microsoft Corp.*, No. 08 Civ. 3547 (DC), 2009 WL 1116360, at *4 (S.D.N.Y. Apr. 27, 2009). As such, when a plaintiff files a federal lawsuit based on "the same operative events as" a prior SDHR or CCHR action, the court lack subject matter jurisdiction to hear those claims. *Marecheau*, 2014 WL 5026142, at *4.

## 2. Bonilla's Claims for Race Discrimination Under the NYSHRL and NYCHRL Are Barred by the Election of Remedies Doctrine

Bonilla concedes that his claims are barred, in part, by the doctrine of election of remedies. Specifically, Bonilla admits that his first SDHR complaint arose out of the July 15, 2017 incident in which he: (i) left his foot post to get his cell phone repaired at One Police Plaza; (ii) was ordered back to the Precinct by Sergeant Isaia, who then punished him by ordering him to stand in the back of the Precinct for the rest of his shift; (iii) approached Sergeant Isaia to explain that he was feeling faint; (iv) was physically assaulted by Sergeants Isaia and Debenedetto, who forcibly took his gun and badge and choked and restrained him until he was unconscious; (v) was transported to a psychiatric hospital; (vi) spent days in a psychiatric hospital against his will; (vii) was placed on

restricted duty; and (viii) was denied a line of duty injury designation.  (*See* Piercey Decl., Ex. B).  In his brief, Bonilla explicitly acknowledges that his state and city law claims relating to this incident, which are described in paragraphs 48 through 73 of his Complaint, are subject to bar based on the election of remedies doctrine.  (*See* Pl. Opp. 4).

The Court's review of the December 2017 SDHR Complaint, however, reveals that Bonilla complained to SDHR about more than just the July 15, 2017 incident.  After Bonilla describes that incident, he states "that is not the first time this happened."  (Piercey Decl., Ex. B at 3).  He goes on to allege other acts of discrimination against him that are also contained in his Complaint — such as allegations that he was ordered to clean and sweep at Yankee Stadium, that he was placed on modified or restricted duty, that he was denied sick leave and line of duty benefits on multiple occasions, and that he was given unfavorable assignments.  (*See id*. at 3-4).[7]  Further, in the January 2017 SDHR Complaint, Bonilla alleged that as a result of the restrictions placed on him due to the July 15, 2017 incident, his promotion to sergeant was placed on

---

[7]     Specifically, Bonilla checked off boxes indicating that he suffered the following acts of discrimination: (i) "Denied me an accommodation for my disability or pregnancy related condition": (ii) "Denied me training": (iii) "Paid me a lower salary than other co-workers doing the same job": (iv) "Denied me promotion/pay raise": (v) "Denied me leave time or other benefits": (vi) "Gave me different or worse job duties than other workers doing the same job": (vii) "Gave me disciplinary notice or negative performance review": (ix) "Harassed/intimated me (other than sexual harassment)": and (x) "Other: denied benefits for [line of duty] reports, made bogus allegations about myself."  (Piercey Decl., Ex. B).

hold and he was transferred to the VIPER Unit as punishment.  (Piercey Decl.,

Ex. D).[8]

At bottom, the operative events underlying Bonilla's SDHR complaints

and the Complaint in this case remain largely the same.  To be fair, there are

certain factual allegations in Bonilla's Complaint that he did not include in his

SDHR complaints.  The main difference between the SDHR complaints and the

Complaint in this action is Bonilla's allegation that Sergeant Debenedetto

evinced racial animus by calling him "Willy Bobo."  However, this difference

does not save Bonilla's NYSHRL and NYCHRL claims from the election of

remedies bar.  Apart from the name-calling, the core allegations of Bonilla's

race and national origin discrimination claim — including the most serious of

the alleged adverse employment actions — were already raised before the

SDHR.  *See Harvin* v. *Manhattan and Bronx Surface Transit Operating Auth.*,

No. 14 Civ. 5125 (CBA) (RER), 2016 WL 11318241, at *4 (E.D.N.Y. Mar. 3,

2016) (finding election of remedies bar applied "even though [plaintiff's] federal

complaint alleges additional facts arising out of the same core discriminatory

conduct and advance[d] new legal theories"), *report and recommendation*

*adopted*, 2018 WL 1603872, at *3 (E.D.N.Y. Mar. 30, 2018); *Carroll* v. *UPS*, 225

---

[8]     On the January 2018 SDHR Complaint, Bonilla checked all the same boxes as the
December 2017 SDHR Complaint, along with additional boxes indicating that he
suffered the following additional acts of discrimination: (i) "Demoted me": (ii) "Denied me
services/treated differently by employment agency": (iii) "Unlawful inquiry, or limitation,
specification or discrimination in job advertisement": and (iv) Other: denied me
promotion by transferring … denied civil service promotion."  (Piercey Decl., Ex. D).  The
complaint also states that Bonilla faced retaliation and that in February 2017 he passed
the civil service test for a promotion that was then denied him.

F.3d 645, 2000 WL 1185583, at *3 (2d Cir. 2000) (summary order) ("Though …

plaintiff's allegations describe some 'retaliatory' conduct by UPS that appears

not to have been presented to the []SDHR, decisions of this court and the New

York state courts indicate that this is of no moment.").

In two decisions, the SDHR dismissed Bonilla's complaints, finding no

probable cause to support his allegations of race, age, disability, and national

origin discrimination and retaliation. (*See* Piercey Decl., Ex. C, E). Under such

circumstances, Bonilla's only recourse with respect to those unfavorable

decisions is to appeal to the Supreme Court of the State of New York pursuant

to N.Y. Exec. Law § 298. *See York*, 286 F.3d at 127. Bonilla's claims of race

and national origin discrimination, race discrimination by virtue of a hostile

work environment, and retaliation for complaining about race discrimination

brought under the NYSHRL and NYCHRL (Causes of Action 2, 3, 5, 6, 8, and 9)

are therefore dismissed.[9]

## C. The Court Sustains Bonilla's Remaining Causes of Action

### 1. Motions to Dismiss under Rule 12(b)(6)

The Court now turns to Bonilla's remaining claims, several of which

Defendants seek to have dismissed for failure to state a claim. When

---

[9]  Defendants claim that Bonilla's NYSHRL and NYCHRL claims for retaliation for
complaining about sexual harassment are also barred by the election of remedies
doctrine. (*See* Def. Br. 11 (listing Causes of Action 15 and 16 as claims barred by the
election of remedies doctrine)). Defendants admit, however, that Bonilla's SDHR
complaints "fail to allege 'sexual harassment' or retaliation based on complaints of
gender-based or sexual harassment, and they do not check the box on the complaint
forms alleging such." (*Id.* at 8). Since Bonilla did not raise his sexual harassment or
retaliation based on complaints of such harassment before the SDHR, those claims are
not barred by the election of remedies doctrine.

considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 570)).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

To survive a motion to dismiss in an employment discrimination lawsuit, a complaint "need not contain specific facts establishing a *prima facie* case of discrimination." *Twombly*, 550 U.S. at 569 (internal alteration and quotation marks omitted) (quoting *Swierkiewicz* v. *Sorema N.A.*, 534 U.S. 506, 508

(2002)).  At the pleading stage, "a plaintiff 'need only give plausible support to a minimal inference of discriminatory motivation.'"  *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (quoting *Littlejohn* v. *City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015)).

## 2. Bonilla Has Adequately Stated a Race Discrimination Claim Under Title VII

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To establish a *prima facie* case of discrimination that can survive a motion to dismiss, a plaintiff must plausibly allege that he or she "[i] is a member of a protected class, [ii] was qualified, [iii] suffered an adverse employment action, and [iv] has at least minimal support for the proposition that the employer was motivated by discriminatory intent."  *Littlejohn*, 795 F.3d at 311.

Defendants do not contest the first two factors.  (*See* Def. Br. 12-17).  The key issues in dispute are whether Bonilla has adequately pleaded that (i) he suffered an adverse employment action; and (ii) Defendants were motivated by discriminatory intent.  (*See id.*).  The Court concludes that he has.

### a. Bonilla Has Plausibly Alleged That He Suffered Adverse Employment Actions

An adverse employment action is a materially adverse change in the terms and conditions of employment.  *Vega*, 801 F.3d at 85.  To constitute an

adverse employment action, the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry* v. *Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Examples of adverse actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (quoting *Galabya* v. *N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). On the other hand, a negative performance review, without more, does not constitute an adverse employment action. *See Fairbrother* v. *Morrison*, 412 F.3d 39, 56-57 (2d Cir. 2005) (collecting cases and concluding that an "unsatisfactory" evaluation with no negative impact on compensation, benefits, or title was not an adverse employment action), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53 (2006).

The Complaint sets forth that Bonilla faced the following adverse employment actions: (i) unfavorable work assignments; (ii) denials of requested assignments; (iii) negative performance evaluations; (iv) denials of leave and line of duty statuses; (v) denial of the opportunity to work a second job; (vi) denial of overtime; (vii) failure to be promoted to sergeant despite passing the civil service examination; (viii) punitive transfer to the VIPER Unit; and (ix) diminished material responsibilities due to the withdrawal of his gun and badge.

Certain of Bonilla's allegations — including: (i) the denial of his promotion to sergeant; (ii) the demands made of him while on detail at Yankee

Stadium; (iii) the actions taken against him during the July 2017 incident; and (iv) the removal of his gun and badge — qualify as adverse employment actions on their own. *See, e.g., Terry*, 336 F.3d at 142-43 ("[A] reasonable fact-finder could conclude that the suspension of [plaintiff's] firearms privileges constituted an adverse employment action."); *Phillips* v. *Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (concluding that refusal to promote constitutes an adverse employment action); *cf. Rodas* v. *Town of Farmington*, 567 F. App'x 24, 27 (2d Cir. 2014) (summary order) (concluding that purportedly degrading tasks do not constitute adverse employment actions because work assignments were within the plaintiff's job description, and the taking of his tools did not constitute an adverse employment action where it did not impede his ability to do his job).

These actions caused more than mere inconvenience for Bonilla; they materially affected his ability to do his job. The denial of Bonilla's promotion had obvious ramifications for his salary and career advancement. Indeed, on reply, Defendants concede that Bonilla's failure to be promoted constitutes an adverse employment action. (*See* Def. Reply 3). While other of Bonilla's allegations — such as his claims that he received negative performance evaluations, unfavorable work assignments, and denials of his requested assignments — would be insufficient alone to sustain a claim for employment discrimination, these acts provide color to Bonilla's claim of discrimination. *See Borrero* v. *Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 438 (S.D.N.Y. 2008) ("[E]ven if some of [plaintiff's] allegations of disparate treatment are not

actionable, they may nonetheless constitute evidence of discrimination in the terms and conditions of her employment. For example, even if unfair public criticism and overbearing scrutiny by themselves are not actionable, they may still show that other more materially adverse actions were motivated by gender.").[10] On the whole, Bonilla adequately alleges that he faced employment actions that rise to the level to sustain an employment discrimination claim. *See Kunik* v. *N.Y.C. Dep't of Educ.*, No. 15 Civ. 9512 (VSB), 2017 WL 4358764, at *9 (S.D.N.Y. Sept. 29, 2017) ("[T]he cumulative effect of [plaintiff's] allegations ... meets the 'minimal' bar necessary to plead an adverse employment action at the pleadings stage.").

### b.   Bonilla Has Plausibly Alleged Discriminatory Animus

The ultimate issue in an employment discrimination case is whether the plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by a discriminatory reason. *Vega*, 801 F.3d at 87. A plaintiff can meet that burden through direct evidence of intent to discriminate or by indirectly showing circumstance giving rise to discrimination. *Id.* "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable

---

[10]   Other of Bonilla's allegations are conclusory, such as the assertion that his transfer to the VIPER Unit was "punitive." The Court has not considered these conclusory allegations in deciding whether Bonilla has adequately alleged an adverse employment action.

treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz* v. *Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

Bonilla's race discrimination claim under Title VII is premised on two separate types of allegations. *First*, Bonilla alleges direct discriminatory animus in the form of the "Willy Bobo" comments. *Second*, Bonilla alleges discrimination by virtue of the disparate treatment of him and the white officers in the 44th Precinct.

Allegations of discriminatory comments directed at a plaintiff's racial group are a recognized method of establishing discriminatory intent. *See Chertkova* v. *Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) (noting that "circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus"). In *Henry* v. *Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 150-51 (2d Cir. 2010), the Second Circuit established a four-factor test to determine whether alleged offensive remarks suggest discriminatory bias or are merely "stray remarks," which generally "do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer* v. *Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir. 1998). The test considers:

> [i] who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); [ii] when the remark was made in relation to the employment decision at issue; [iii] the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and [iv] the context in which the

31

> remark was made (i.e., whether it was related to the decision-making process).

*Wyeth Pharmaceuticals,* 616 F.3d at 149-50; *accord Fried* v. *LVI Servs., Inc.*, 500 F. App'x 39, 41 (2d Cir. 2012) (summary order).

Further, a plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably.  *See Shumway* v. *United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997) (holding that plaintiff could raise an inference of sex discrimination by showing that a similarly situated man was treated differently).  In order to make such a showing, the plaintiff must compare himself to employees who are similarly situated in all material respects.  *Id.* at 64.  "Similarly situated in all material respects" does not mean all respects generally, but rather sufficiently similar to support at least a minimal inference that the difference of treatment may be attributable to discrimination. *McGuinness* v. *Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001).

Considering the factors set out in *Wyeth Pharmaceuticals*, Sergeant Debenedetto's repeated references to Bonilla as "Willy Bobo" give rise to a plausible inference of race discrimination.  It is not lost on the Court that "Willy Bobo" appears to be a nickname based on Bonilla's own name: Wilfrido Bonilla.  However, Bonilla's contention that "Willy Bobo" is a racial slur used for Latin Americans (since the word "bobo" means "fool" in Spanish) is plausible.  The "Willy Bobo" comments were made by one of Bonilla's direct supervisors in the 44th Precinct.  (*See* Compl. ¶ 11).  And Bonilla alleges that Sergeant

Debenedetto made these comments to Bonilla on a repeated basis — over 40 times, despite repeated pleas that he stop — throughout Bonilla's tenure at the 44th Precinct. (*See id.* at ¶ 12). Bonilla also alleges that Sergeant Debenedetto was involved in the decisions regarding Bonilla's assignments; was one of the persons who took Bonilla's gun and badge; and falsely told the EMTs that Bonilla was suicidal. If Bonilla's allegation that "Willy Bobo" is a racial slur proves true, a jury could reasonably infer that Sergeant Debenedetto subjected Bonilla to adverse employment action on the basis of his race.

Bonilla bolsters his claim of race discrimination with allegations that white officers in his Precinct were given preferential treatment. Specifically, Bonilla alleges that: (i) multiple white officers in his Precinct were granted line of duty injury designations after suffering injuries in similar circumstances to Bonilla's; (ii) white officers on detail at Yankee Stadium were never ordered to clean the bathrooms; (iii) white officers were given more favorable and less dangerous assignments; (iv) white officers were given substantially more overtime opportunities; (v) white officers were given higher performance evaluations; (vi) white officers were given greater opportunities to be promoted due to their race; (vii) white officers were routinely granted time off for bereavement; (viii) white officers were routinely approved for second jobs in the same circumstances in which Bonilla's application was denied. To be fair, many of these allegations are vague. Besides providing a laundry list of white officers whom Bonilla alleges were treated more favorably than he, Bonilla fails in many ways to show that these officers were similarly situated to him.

However, when combined with his allegations of direct racial animus, Bonilla has done enough to nudge his claim of race discrimination over the line from conceivable to plausible. *See Vega*, 801 F.3d at 87 (noting that a plaintiff can allege discrimination through a "'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination" (quoting *Gallagher* v. *Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)).

### 3. Bonilla Has Adequately Stated a Hostile Work Environment Claim Under Title VII

#### a. Applicable Law

"To establish a hostile work environment under Title VII, ... a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The Second Circuit has explained that a *prima facie* hostile work environment claim under Title VII has three elements — "a plaintiff must plead facts that would tend to show that the complained of conduct":

> [i] is objectively severe or pervasive — that is, ... creates an environment that a reasonable person would find hostile or abusive; [ii] creates an environment that the plaintiff subjectively perceives as hostile or abusive; and [iii] creates such an environment because of the plaintiff's [protected characteristic].

*Patane* v. *Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (quoting *Raspardo* v. *Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).

Significantly, to survive a Rule 12(b)(6) motion to dismiss, a Title VII complaint need not establish every element of a *prima facie* hostile work environment claim. "At the motion to dismiss stage, ... 'a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Cowan* v. *City of Mount Vernon*, No. 14 Civ. 8871 (KMK), 2017 WL 1169667, at *4 (S.D.N.Y. Mar. 28, 2017) (internal quotation marks and alterations omitted) (quoting *Patane*, 508 F.3d at 113). "In evaluating whether the circumstances" set forth in a complaint "suffice to find a hostile work environment, the [Second Circuit] has 'repeatedly cautioned against setting the bar too high.'" *Lewis* v. *Roosevelt Island Operating Corp.*, 246 F. Supp. 3d 979, 990 (S.D.N.Y. 2017) (quoting *Patane*, 508 F.3d at 113).

At bottom, a court tasked with determining whether a work environment was actionably hostile "must consider the totality of the circumstances including [i] the frequency of the discriminatory conduct; [ii] its severity; [iii] whether it is threatening and humiliating, or a mere offensive utterance;

and [iv] whether it unreasonably interferes with an employee's work performance." *Littlejohn*, 985 F.3d at 321 (internal quotation marks omitted). This analysis is "highly context-dependent," and courts assessing a workplace's hostility "should evaluate the facts holistically rather than 'view individual incidents in isolation' or in a 'piecemeal fashion.'" *Johnson* v. *J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 306 (S.D.N.Y. 2016) (quoting *Redd* v. *N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012)).

"Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Alfano* v. *Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). But "'a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace.'" *Green* v. *Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 470 (S.D.N.Y. 2017) (quoting *Feingold* v. *New York*, 366 F.3d 138, 150 (2d Cir. 2004)). "[T]hat single act must be 'extraordinarily severe'" to rise to the level of a Title VII violation. *Id.* (quoting *Alfano*, 294 F.3d at 374).

### b.    Bonilla Has Plausibly Alleged a Hostile Work Environment

Applying these principles, Bonilla has stated a hostile work environment claim. Bonilla has alleged that, throughout the course of his tenure at the 44th Precinct, his direct supervisor repeatedly referred to him using a racial slur meaning "fool" after Bonilla asked him to stop several times. Bonilla also claims that: (i) he was assigned to clean the bathrooms at Yankee Stadium,

which is not a typical law enforcement task; (ii) he was denied a meal break after telling his supervisors that he was faint from lack of nourishment; (iii) he was physically assaulted by his supervisors Sergeants Debenedetto and Isaia; and (iv) Sergeants Debenedetto and Isaia then told the EMTs caring for Bonilla that he was suicidal, which led to Bonilla being held at the hospital, against his will, for nine days.

The story Bonilla tells in his Complaint about the manner in which he was treated for the two years he worked in the 44th Precinct does enough to establish that Bonilla was subject to a hostile work environment based, at least in part, on his race. Bonilla's claim does not rest on an isolated incident or stray remarks, but on a pattern of abusive activity of a quality and quantity that a reasonable employee would find worsened the conditions of his employment. *See Dawson* v. *Cty. of Westchester*, 373 F.3d 265, 274 (2d Cir. 2004) (holding that a hostile work environment claim "must be evaluated on the basis of the cumulative effect of the abusive conduct").

### 4. Bonilla Has Adequately Stated an Unlawful Retaliation Claim Under Title VII

#### a. Applicable Law

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: [i] that she was engaged in protected activity by opposing a practice made unlawful by Title VII; [ii] that the employer was aware of that activity; [iii] that she suffered adverse employment action; and [iv] that there was a causal connection between the protected activity and the adverse action." *Galdieri-Ambrosini* v. *Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.

1998).  However, at the pleading stage, the burden on the plaintiff is less onerous.  To survive a motion to dismiss, the plaintiff must plausibly allege that defendants discriminated against him or took an adverse employment action against him because he opposed an unlawful employment practice. *Vega*, 801 F.3d at 90; *see Littlejohn*, 795 F.3d at 316.  Notably, unlike a claim for discrimination itself, in assessing whether a plaintiff has pleaded a cause of action for retaliation, the proper question is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination.  *Davis-Garett* v. *Urban Outfitters, Inc.*, 921 F.3d 30, 43-44 (2d Cir. 2019).

### b.    Bonilla Has Plausibly Alleged Retaliation

Bonilla sets forth two instances of protected activity that could form the basis for his retaliation claim.  *First*, Bonilla explains that on July 5, 2017, he complained to his Union Delegate and ICO Morales and filed a written complaint with the NYPD complaining of a hostile work environment due primarily to the conduct of Sergeants Debenedetto and Isaia.  (Compl. ¶¶ 39-40).  After Bonilla made these complaints, ICO Morales laughed at Bonilla and ordered Bonilla to place his gun in his locker, a procedure followed for anyone in the NYPD believed to be suicidal.  (*See id.* at ¶¶ 41, 43-45).  Shortly after his complaint, Bonilla's promotion to sergeant was delayed.  And, notably, the incident that led to Bonilla's hospitalization occurred in July 2017.  (*See id.* at ¶¶ 47-71).  These events suffice to show that a reasonable employee in Bonilla's position would have been dissuaded from filing a complaint.

38

*Second*, Bonilla alleges that he faced retaliation after he complained to OEEO, in December 2017, about the discrimination he faced in the 44th Precinct. Bonilla claims that, in retaliation for filing a complaint with OEEO, he was denied permission to obtain a second job and was denied overtime. (Compl. ¶¶ 102, 104). This claim of retaliation is far weaker than Bonilla's first and it fails for several reasons. *First*, Bonilla claims he was denied overtime well *before* he filed the December 2017 complaint. Thus, the denial of overtime could not have been in retaliation for protected activity. *Second*, Bonilla alleges a years-long campaign of adverse employment actions taken against him — that he was only denied permission to obtain a second job after his December 2017 complaint does not give rise to an inference of retaliation. *See Nicastro* v. *N.Y. Dep't of Design & Constr.*, 125 F. App'x 357, 358 (2d Cir. 2005) (summary order) ("Although temporal proximity can demonstrate a causal nexus … where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." (internal quotation marks, citations, and alterations omitted)). *Third*, Bonilla's December 2017 complaint pertained to race discrimination he experienced in the 44th Precinct. (Compl. ¶¶ 89-90). However, by the time Bonilla made that complaint, he had already been transferred to the PSA 6 Bronx, VIPER Unit. (*Id.* at ¶ 81). Bonilla does not allege that his supervisors at his new unit were even aware of his complaint to OEEO.

For this claim of retaliation, Bonilla does not plead any facts to indicate that the adverse employment actions taken against him had any relation to his December 2017 complaints. He relies solely on the temporal proximity of the adverse employment actions with his protected activity. Given the totality of Bonilla's allegations, the temporal proximity does not raise an inference of retaliation. Therefore, the Court concludes that Bonilla has failed to allege retaliation based on his December 2017 complaint.

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Defendants' motion is DENIED with respect to Bonilla's Title VII claims for: (i) race discrimination (Count 1); (ii) hostile work environment based on race discrimination (Count 4); and (iii) retaliation for complaining about race discrimination (Count 7).

Defendants' motion is further DENIED with respect to Bonilla's claims for retaliation for complaining about sexual harassment in violation of the NYSHRL (Count 15) and NYCHRL (Count 16).

Defendants' motion is GRANTED with respect to: (i) race discrimination in violation of the NYSHRL (Count 2) and NYCHRL (Count 3); (ii) race discrimination by virtue of a hostile work environment in violation of the NYSHRL (Count 5) and NYCHRL (Count 6); (iii) retaliation for complaining about race discrimination in violation of the NYSHRL (Count 8) and NYCHRL (Count 9); (iv) hostile work environment due to sexual harassment in violation

of Title VII (Count 10); and (v) retaliation for complaining about sexual harassment in violation of Title VII (Count 14). Because the latter two claims are dismissed for failure to exhaust, the dismissals are without prejudice.[11]

The Clerk of Court is directed to terminate the motion at docket entry 32.

On or before **December 6, 2019**, Defendants shall file a responsive pleading.

On or before **December 30, 2019**, the parties shall submit a proposed Case Management Plan, as well as the joint status letter contemplated by the Plan.

SO ORDERED.

Dated:      November 15, 2019
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

[11] Bonilla also has remaining claims for hostile work environment due to sexual harassment in violation of the NYSHRL (Count 11) and NYCHRL (Count 12), and for sex discrimination in violation of the Fourteenth Amendment's Equal Protection Clause (Count 13). Defendants did not move with respect to these claims.